# In the United States Court of Federal Claims

No. 16-649C

(Filed: February 9, 2017)

```
*************************************
                                    *
MODA HEALTH PLAN, INC.,             *
                                    *
                    Plaintiff,      *
                                    *
v.                                  *
                                    *
THE UNITED STATES,                  *
                                    *
                    Defendant.      *
                                    *
*************************************
```

Patient Protection and Affordable Care Act § 1342; Risk Corridors; Presently-Due Money Damages; Ripeness; Chevron Deference; Appropriation Restriction Limiting Statutory Obligation; Judgment Fund; Implied-in-Fact Contract Created by Statute.

*Steven J. Rosenbaum*, with whom were *Caroline M. Brown* and *Philip J. Peisch*, Covington & Burling LLP, Washington, D.C., for Plaintiff.

*Phillip M. Seligman*, with whom were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Ruth A. Harvey*, Director, and *Kirk T. Manhardt*, Deputy Director, as well as *Terrance A. Mebane*, *Charles E. Canter*, *Serena M. Orloff*, *Frances M. McLaughlin*, and *L. Misha Preheim*, Trial Attorneys, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for Defendant.

## OPINION AND ORDER

WHEELER, Judge.

    Plaintiff Moda Health Plan, Inc. ("Moda") offers health insurance plans through Health Benefit Exchanges created under the Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010). To encourage insurers like Moda to offer health insurance on the exchanges, the ACA created a system of risk corridors under which the Government would pay insurers if they suffered losses during the first three years of the ACA's implementation (2014–2016). Conversely, insurers would pay the Government a percentage of any profits they received in each of these first three years. Moda suffered losses on its health insurance plans during 2014 and 2015. To date, the

Government has paid 12.6 percent of Moda's claimed risk corridors payment for 2014, and has made no risk corridors payments for 2015.

Moda brought this case in June 2016 to obtain full risk corridors payments for the 2014 and 2015 plan years—in total, over $214 million.  Moda primarily alleges that the Government is liable for the payments under the ACA and its implementing regulations, and argues in the alternative that the ACA's risk corridors program created an implied-in-fact contract between insurers and the Government.  The Government has moved to dismiss this case under Rules 12(b)(1) and 12(b)(6) of the Court of Federal Claims ("RCFC").  It argues that the court lacks jurisdiction over this case because risk corridor payments are not "presently due," and that the case is not ripe because the Government has until the end of 2017 to make full risk corridors payments.  On the merits, the Government also argues mainly that (1) the risk corridors program is required to be budget-neutral, so the Government only owes risk corridors payments to the extent that profitable insurers pay money into the program; and (2) Congress's failure to appropriate money for risk corridors payments constitutes either a repeal of the Government's risk corridors obligations or an amendment that makes the program budget-neutral.  The Government further argues that the ACA and its implementing regulations did not form a contract between insurers and the Government.  Moda has cross-moved for partial summary judgment on the issue of liability.

The Court held oral argument on the cross-motions on January 13, 2017.  After considering the parties' arguments in court and in their filings, the Court finds that the Government has unlawfully withheld risk corridors payments from Moda, and is therefore liable.  The Court finds that the ACA requires annual payments to insurers, and that Congress did not design the risk corridors program to be budget-neutral.  The Government is therefore liable for Moda's full risk corridors payments under the ACA.  In the alternative, the Court finds that the ACA constituted an offer for a unilateral contract, and Moda accepted this offer by offering qualified health plans on the Health Benefit Exchanges.  The Government's motion to dismiss is therefore DENIED, and Moda's cross-motion for partial summary judgment is GRANTED.

Background

Congress passed the ACA in 2010 in a dramatic overhaul of the nation's healthcare system.  Central to the Act's infrastructure was a network of "Health Benefit Exchanges" ("Exchanges") on which insurers would offer Qualified Health Plans ("QHPs") to eligible purchasers.  ACA §§ 1311, 1321, 42 U.S.C. §§ 18031, 18041 (2012).  The ACA also drastically enlarged the pool of eligible insurance purchasers.  It expanded Medicaid eligibility, ACA § 2001, and provided subsidies to low-income insurance purchasers, ACA §§ 1401, 1402; 42 C.F.R. § 155.305(f), (g).  It also prohibited insurers from denying

coverage or setting increased premiums based on a purchaser's medical history. ACA § 1201(2)(A); 42 U.S.C. §§ 300gg-1–300gg-5 (2012).

In short, the ACA created a tectonic shift in the insurance market. It gave insurers like Moda access to a large new customer base, but insurers also had to comply with the ACA's rules if they wanted to offer QHPs on the Exchanges. To help insurers adjust to the Exchanges, Congress included three provisions in the ACA—commonly known as the "3Rs"—that reduced insurers' risk: reinsurance, risk corridors, and risk adjustment. See ACA §§ 1341–43. The second of these 3Rs, the risk corridors program, is the subject of this case.

A.   <u>Congress Creates the Risk Corridors Program</u>

Section 1342 of the ACA sets out the risk corridors program. It reads as follows:

> (a) IN GENERAL.--The Secretary shall establish and administer a program of risk corridors for calendar years 2014, 2015, and 2016 under which a qualified health plan offered in the individual or small group market shall participate in a payment adjustment system based on the ratio of the allowable costs of the plan to the plan's aggregate premiums. Such program shall be based on the program for regional participating provider organizations under part D of title XVIII of the Social Security Act.
>
> (b) PAYMENT METHODOLOGY.--
>
>    (1) PAYMENTS OUT.--The Secretary shall provide under the program established under subsection (a) that if--
>
>        (A) a participating plan's allowable costs for any plan year are more than 103 percent but not more than 108 percent of the target amount, the Secretary shall pay to the plan an amount equal to 50 percent of the target amount in excess of 103 percent of the target amount; and
>
>        (B) a participating plan's allowable costs for any plan year are more than 108 percent of the target amount, the Secretary shall pay to the plan an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent of the target amount.

3

(2) PAYMENTS IN.--The Secretary shall provide under the program established under subsection (a) that if--

(A) a participating plan's allowable costs for any plan year are less than 97 percent but not less than 92 percent of the target amount, the plan shall pay to the Secretary an amount equal to 50 percent of the excess of 97 percent of the target amount over the allowable costs; and

(B) a participating plan's allowable costs for any plan year are less than 92 percent of the target amount, the plan shall pay to the Secretary an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of the excess of 92 percent of the target amount over the allowable costs.

(c) DEFINITIONS.--In this section:

(1) ALLOWABLE COSTS.--

(A) IN GENERAL.--The amount of allowable costs of a plan for any year is an amount equal to the total costs (other than administrative costs) of the plan in providing benefits covered by the plan.

(B) REDUCTION FOR RISK ADJUSTMENT AND REINSURANCE PAYMENTS.--Allowable costs shall [be] reduced by any risk adjustment and reinsurance payments received under section 1341 and 1343.

(2) TARGET AMOUNT.--The target amount of a plan for any year is an amount equal to the total premiums (including any premium subsidies under any governmental program), reduced by the administrative costs of the plan.

ACA § 1342 (codified at 42 U.S.C. § 18062 (2012)).  Congress did not specifically appropriate funds for the risk corridors program in the ACA.

B.    HHS Implements the Risk Corridors Program

1.    HHS Promulgates a Final Rule

To "establish and administer" the risk corridors program in accordance with Section 1342, the Department of Health and Human Services ("HHS") subsequently began its rulemaking process.  After a notice and comment period, HHS published its final rule on March 23, 2012.  That rule states, in pertinent part:

> (a) General requirement. A QHP issuer must adhere to the requirements set by HHS in this subpart and in the annual HHS notice of benefit and payment parameters for the establishment and administration of a program of risk corridors for calendar years 2014, 2015, and 2016.

> (b) HHS payments to health insurance issuers. QHP issuers will receive payment from HHS in the following amounts, under the following circumstances:

> (1) When a QHP's allowable costs for any benefit year are more than 103 percent but not more than 108 percent of the target amount, HHS will pay the QHP issuer an amount equal to 50 percent of the allowable costs in excess of 103 percent of the target amount; and

> (2) When a QHP's allowable costs for any benefit year are more than 108 percent of the target amount, HHS will pay to the QHP issuer an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent of the target amount.

> (c) Health insurance issuers' remittance of charges. QHP issuers must remit charges to HHS in the following amounts, under the following circumstances:

> (1) If a QHP's allowable costs for any benefit year are less than 97 percent but not less than 92 percent of the target amount, the QHP issuer must remit charges to HHS in an amount equal to 50 percent of the difference between 97 percent of the target amount and the allowable costs; and

> (2) When a QHP's allowable costs for any benefit year are less than 92 percent of the target amount, the QHP issuer must remit charges to HHS in an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of the difference between 92 percent of the target amount and the allowable costs.

Risk Corridors Establishment and Payment Methodology, 77 Fed. Reg. 17251 (Mar. 23, 2012) (codified at 45 C.F.R. § 153.510).  In another rule it released that day, HHS added, "A QHP issuer must submit to HHS data on the premiums earned with respect to each QHP that the issuer offers in the manner and timeframe set forth in the annual HHS notice of benefit and payment parameters."  Risk Corridors Data Requirements, 77 Fed. Reg. 17251 (Mar. 23, 2012) (codified at 45 C.F.R. § 153.530(a)).

In the same publication, HHS also released an impact analysis of its proposed rules in which it cited the findings of the Congressional Budget Office.  As HHS noted, the CBO did not score the risk corridors program in its projections:

> CBO estimated program payments and receipts for reinsurance and risk adjustment. . . .  CBO did not score the impact of the risk corridors program, but assumed collections would equal payments to plans in the aggregate.  The payments and receipts in risk adjustment and reinsurance are financial transfers between issuers and the entities running those programs.

Impact Analysis, 77 Fed. Reg. 17,220, 17,244 (Mar. 23, 2012).

Furthermore, HHS did not set deadlines in its new rules by which HHS needed to pay insurers, but it indicated that it was considering setting such deadlines:

> We suggested, for example, that a QHP issuer required to make a risk corridors payment may be required to remit charges within 30 days of receiving notice from HHS, and that HHS would make payments to QHP issuers that are owed risk corridors amounts within a 30-day period after HHS determines that a payment should be made to the QHP issuer. QHP issuers who are owed these amounts will want prompt payment, and payment deadlines should be the same for HHS and QHP issuers.  We sought comment on these proposed payment deadlines in the preamble to the proposed rule.

Id. at 17,237.

2.      CMS Promulgates an Additional Rule Governing the Schedule of the
        Risk Corridors Program

HHS had also delegated rulemaking authority for the risk corridors program to the
Centers for Medicare and Medicaid Services ("CMS"), one of HHS's subsidiary agencies.
See Delegation of Authorities, 76 Fed. Reg. 53,903-04 (Aug. 30, 2011).  Pursuant to that
authority, CMS on December 7, 2012 proposed adding language that would give the
program an annual schedule.  In its proposed rule's prefatory remarks, CMS noted that
"[t]he temporary risk corridors program permits the Federal government and QHPs to share
in profits or losses resulting from inaccurate rate setting from 2014 to 2016.  In this
proposed rule, we propose . . . an annual schedule for the program and standards for data
submissions."  HHS Notice of Benefit and Payment Parameters for 2014, 77 Fed. Reg.
73,118, 73,121 (Dec. 7, 2012).  To that end, CMS proposed a deadline of "July 31 of the
year following the applicable benefit year" by which insurers would submit charges to
HHS under the risk corridors program.  Risk Corridors Establishment and Payment
Methodology, 77 Fed Reg. 73,164 (proposed Dec. 7, 2012).

CMS's final rule, issued March 11, 2013, made two changes in HHS's earlier
regulations.  First, the rule added the following subsection to 45 C.F.R. § 153.510:
"(d) Charge submission deadline.  A QHP issuer must remit charges to HHS within 30 days
after notification of such charges."  Risk Corridors Establishment and Payment
Methodology, 78 Fed. Reg. 15,531 (Mar. 11, 2013).  It also amended Section 153.530 by
adding the following subsection: "(d) Timeframes.  For each benefit year, a QHP issuer
must submit all information required under this section by July 31 of the year following
the benefit year."  Risk Corridors Data Requirements, 78 Fed. Reg. 15,531 (Mar. 11, 2013).

On the same day it released its rule governing the schedule of the risk corridors
program, CMS also addressed several comments it had received about a potential situation
in which HHS's required "payments out" could exceed profitable insurers' "payments in"
to the program.  CMS responded, "The risk corridors program is not statutorily required to
be budget neutral.  Regardless of the balance of payments and receipts, HHS will remit
payments as required under section 1342 of the [ACA]."  78 Fed. Reg. at 15,473.

C.      Moda Offers QHPs on the Exchanges, and HHS Announces
        the Transitional Policy

With the final risk corridors program rules in place, Moda submitted its QHPs and
premium rates to state healthcare regulators in Alaska and Oregon.  The state regulators
approved the plans in July 2013.  See App'x to Pl. Cross-Mot. ("Pl. App'x") at A7–22.  As
required by HHS regulations, Moda began selling QHPs to consumers on the Exchanges
on October 1, 2013, with coverage effective January 1, 2014.  See 45 C.F.R. § 155.410(b)–
(c).

Shortly after Moda and other insurers began selling QHPs, it became apparent that some consumers' health insurance coverage would be terminated because it did not comply with the ACA.    To minimize the hardship that these large-scale health insurance terminations would cause, HHS announced a transitional policy in November 2013.[1] Under the transitional policy, health plans in the individual or small group market that were in effect on October 1, 2013 were "not . . . considered to be out of compliance with the [ACA's] market reforms" for the 2014 plan year.  Transitional Policy Letter at 1–2.  This change was significant because consumers with non-compliant healthcare plans now were not required to purchase insurance on the Exchanges from insurers like Moda.  These consumers tended to be healthier, so excluding them from the exchanges left a sicker (and therefore, potentially more expensive) group of potential insurance buyers.[2]    HHS acknowledged the transitional policy's impact on insurers in its announcement, stating, "Though this transitional policy was not anticipated by health insurance issuers when setting rates for 2014, the risk corridor program should help ameliorate unanticipated changes in premium revenue.  We intend to explore ways to modify the risk corridor program final rules to provide additional assistance."  Transitional Policy Letter at 3.  HHS has renewed the transitional policy twice, and it will now extend through October 1, 2017.[3]

Although HHS cited the risk corridors program as an ameliorating force in the Transitional Policy Letter, it noted in further rulemaking on March 11, 2014—three months after the QHPs Moda had sold were in effect—that it "intend[ed] to implement this program in a budget neutral manner."  HHS Notice of Benefit and Payment Parameters for 2015, 79 Fed. Reg. 13,744, 13,787 (Mar. 11, 2014).  It elaborated:

> Our initial modeling suggests that th[e] adjustment for the transitional policy could increase the total risk corridors payment amount made by the Federal government and

---

[1]  See Ltr. From Gary Cohen, Dr., Ctr. For Consumer Info. and Ins. Oversight ("CCIIO"), to State Ins. Comm'rs (Nov. 14, 2013), https://www.cms.gov/cciio/resources/letters/downloads/commissioner-letter-11-14-2013.pdf ("Transitional Policy Letter").

[2]  See, e.g., HHS 2015 Health Policy Standards Fact Sheet (Mar. 5, 2014) ("Because issuers' premium estimates did not take the transitional policy into account, the transitional policy could potentially lead to unanticipated higher average claims costs for issuers of plans that comply with the 2014 market rules."), https://www.cms.gov/Newsroom/MediaReleaseDatabase/Fact-sheets/2014-Fact-sheets-items/2014-03-05-2.html.

[3]  See Gary Cohen, Dir., CCIIO, Insurance Standards Bulletin Series – Extension of Transitional Policy through October 1, 2016, CMS (Mar. 5, 2014), https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/transition-to-compliant-policies-03-06-2015.pdf; Kevin Counihan, Dir., CCIIO, Insurance Standards Bulletin Series – INFORMATION – Extension of Transitional Policy through Calendar Year 2017, CMS (Feb. 29, 2016), https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/final-transition-bulletin-2-29-16.pdf

> decrease risk corridors receipts, resulting in an increase in
> payments.  However, we estimate that even with this change,
> the risk corridors program is likely to be budget neutral or, will
> result in net revenue to the Federal government.

Id. at 13,829.

In adopting budget neutrality as a goal for the risk corridors program, HHS reversed
the statement it had made exactly one year earlier.  Compare 79 Fed. Reg. at 13,787 with
78 Fed. Reg. at 15,473.  Furthermore, the CBO apparently disagreed with HHS's budget-
neutral interpretation.  In February 2014—before HHS's first statement on budget
neutrality—the CBO released a report that addressed the ACA's effects on the federal
budget.[4]  Addressing the risk corridors program, the CBO noted:

> By law, risk adjustment payments and reinsurance payments
> will be offset by collections from health insurance plans of
> equal magnitudes; those collections will be recorded as
> revenues.  As a result, those payments and collections can have
> no net effect on the budget deficit.  In contrast, risk corridor
> collections (which will be recorded as revenues) will not
> necessarily equal risk corridor payments, so that program can
> have net effects on the budget deficit.  CBO projects that the
> government's risk corridor payments will be $8 billion over
> three years and that its collections will be $16 billion over that
> same period . . . .

CBO Report at 59.  Thus, while the CBO believed the risk corridors program would result
in a net gain of $8 billion for the Government, it specifically noted that the program—
unlike the risk adjustment and reinsurance programs—was not budget-neutral.

D.    HHS Grapples with Budget Neutrality

HHS, like CBO, expected that "payments in" to the risk corridors program would
equal or exceed "payments out" of the program.  Still, HHS realized that implementing the
program in a budget-neutral manner at least hypothetically might result in a shortfall in risk

---

[4]  See The Budget and Economic Outlook: 2014 to 2024 (Feb. 2014),
https://www.cbo.gov/sites/default/files/113th-congress-2013-2014/reports/45010-outlook2014feb0.pdf.
("CBO Report").

corridors payments to insurers.  On April 11, 2014, it released a memorandum to address such a situation in the form of questions and answers.[5]  HHS stated, in pertinent part:

> Q1:   In [prior rulemaking], HHS indicated that it intends to implement the risk corridors program in a budget neutral manner.  What risk corridors payments will HHS make if risk corridors collections for a year are insufficient to fund risk corridors payments for the year, as calculated under the risk corridors formula?
>
> A1:   We anticipate that risk corridors collections will be sufficient to pay for all risk corridors payments.  However, if risk corridors collections are insufficient to make risk corridors payments for a year, all risk corridors payments for that year will be reduced pro rata to the extent of any shortfall.  Risk corridors collections received for the next year will first be used to pay off the payment reductions issuers experienced in the previous year in a proportional manner, up to the point where issuers are reimbursed in full for the previous year, and will then be used to fund current year payments.  If, after obligations for the previous year have been met, the total amount of collections available in the current year is insufficient to make payments in that year, the current year payments will be reduced pro rata to the extent of any shortfall.  If any risk corridors funds remain after prior and current year payment obligations have been met, they will be held to offset potential insufficiencies in risk corridors collections in the next year.
>
> *          *          *
>
> Q2:   What happens if risk corridors collections do not match risk corridors payments in the final year of risk corridors?
>
> A2:   We anticipate that risk corridors collections will be sufficient to pay for all risk corridors payments over the life of the three-year program.  However, we will establish in future guidance or rulemaking how we will calculate risk corridors payments if

---

[5]  See HHS, Risk Corridors and Budget Neutrality (Apr. 11, 2014), https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/Downloads/faq-risk-corridors-04-11-2014.pdf ("Risk Corridors Mem.").

> risk corridors collections (plus any excess collections held over from previous years) do not match risk corridors payments as calculated under the risk corridors formula for the final year of the program.

*   *   *

> Q4:   In the 2015 Payment Notice, HHS stated that it might adjust risk corridors parameters up or down in order to ensure budget neutrality.  Will there be further adjustments to risk corridors in addition to those indicated in this FAQ?

> A4:   HHS believes that the approach outlined in this FAQ is the most equitable and efficient approach to implement risk corridors in a budget neutral manner.  However, we may also make adjustments to the program for benefit year 2016 as appropriate.

Risk Corridors Mem. at 1–2.  Therefore, HHS acknowledged that it would make annual "payments out" to lossmaking QHP issuers, but it would reduce these payments pro rata if "payments in" did not equal its liability for "payments out."

HHS elaborated on its two-page memorandum in further notice and comment rulemaking on May 27, 2014.  It acknowledged that it "intend[ed] to administer risk corridors in a budget neutral way over the three-year life of the program, rather than annually," despite several commenters' concerns that such an approach would violate the intent of Section 1342.  Exchange and Insurance Market Standards for 2015 and Beyond, 79 Fed. Reg. 30,240, 30,260 (May 27, 2014).  Still, HHS recognized its obligation under the ACA to make full risk corridors payments:

> [W]e anticipate that risk corridors collections will be sufficient to pay for all risk corridors payments.  That said, we appreciate that some commenters believe that there are uncertainties associated with rate setting, given their concerns that risk corridors collections may not be sufficient to fully fund risk corridors payments.  In the unlikely event of a shortfall for the 2015 program year, HHS recognizes that the Affordable Care Act requires the Secretary to make full payments to issuers.  In that event, HHS will use other sources of funding for the risk corridors payments, subject to the availability of appropriations.

11

Id.

In sum, HHS decided in 2014 that it would administer the risk corridors program in a budget-neutral manner over the three-year life of the program.  It considered a shortfall in "payments in" unlikely, and believed that "payments in" would balance "payments out" of the program.  Importantly, it recognized that a shortfall in "payments in" would not vitiate its statutory duty to make full "payments out."

E.     Congress Restricts Appropriations to the Risk Corridors Program

1.     The GAO Opines on Risk Corridors Funding

On September 30, 2014, the Government Accountability Office ("GAO") responded to a request from Senator Jeff Sessions and Congressman Fred Upton.  See GAO Op., Pl. App'x at A151.  The two members of Congress had asked the GAO for an "opinion regarding the availability of appropriations" for risk corridors payments.  Id.  The GAO found that the CMS Program Management appropriation for fiscal year 2014 "would have been available" for risk corridors payments.  Id. at A154.  It further found that the "payments in" from profitable insurers under Section 1342(b)(2) of the ACA were available for risk corridors payments because they were "properly characterized as user fees."  Id. at A156.  In other words, profitable QHP issuers who paid into the program were "paying for the certainty that any potential losses related to [their] participation in the Exchanges [were] limited to a certain amount."  Id.  The letter also noted that HHS itself had not identified the CMS Program Management appropriation as available for risk corridors payments, but that it had identified the "user fees" paid under Section 1342(b)(2). Id.  The GAO concluded that HHS could continue to access user fees from "payments in" in future plan years.  Id.  In contrast, it stated that Congress would need to include similar appropriations language in future CMS Program Management appropriations to allow HHS to continue to access the CMS Program Management account for risk corridors payments. Id.

2.     Congress Restricts Appropriations for Risk Corridors Payments in 2015 and 2016

In fiscal years 2015 and 2016, Congress made the CMS Program Management appropriation unavailable for risk corridors payments.  On December 16, 2014, Congress enacted the Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, 128 Stat. 2130, for the 2015 fiscal year.  In the HHS appropriation, the Act states:

> None of the funds made available by this Act from the Federal
> Hospital Insurance Trust Fund or the Federal Supplemental
> Medical Insurance Trust Fund, or transferred from other

12

> accounts funded by this Act to the "Centers for Medicare and
> Medicaid Services-Program Management" account, may be
> used for payments under section 1342(b)(1) of [the ACA]
> (relating to risk corridors).

Id. at div. G, tit. II, § 227, 128 Stat. at 2491.  The Chairman of the House Committee of
Appropriations explained this provision as follows:

> In 2014, HHS issued a regulation stating that the risk corridor
> program will be budget neutral, meaning that the federal
> government will never pay out more than it collects from
> issuers over the three year period risk corridors are in effect.
> The agreement includes new bill language to prevent the CMS
> Program Management appropriation account from being used
> to support risk corridors payments.

160 Cong. Rec. H9838 (daily ed. Dec. 11, 2014).

Congress included the exact same funding restriction in the Consolidated
Appropriations Act, 2016, Pub. L. No. 114-113 at div. H, tit. II, § 225, 129 Stat. 2242,
2624.  The 2016 Act also included a further funding provision related to risk corridors:

> In addition to the amounts otherwise available for "Centers for
> Medicare and Medicaid Services, Program Management", the
> Secretary of Health and Human Services may transfer up to
> $305,000,000 to such account from the Federal Hospital
> Insurance Trust Fund and the Federal Supplementary Medical
> Insurance Trust Fund to support program management activity
> related to the Medicare program: *Provided*, That except for the
> foregoing purpose, such funds may not be used to support any
> provision of [the ACA] or Public Law 111-152 (or any
> amendment made by either such Public Law) or to supplant
> any other amounts within such account.

Id. at div. H, tit. II, § 226, 129 Stat. at 2625.  To explain this language, the Senate
Committee on Appropriations noted in a June 25, 2015 report that "[t]he Committee
continues bill language requiring the administration to operate the Risk Corridor program
in a budget neutral manner by prohibiting any funds from the Labor-HHS-Education
appropriations bill to be used as payments for the Risk Corridor program."  S. Rep. No.
114-74, at 12.

F.    HHS Pays Insurers a Fraction of Their Risk Corridors Claims

On October 1, 2015, HHS announced that it owed insurers $2.87 billion in Risk Corridors payments for the 2014 plan year.[6]  Insurers' "payments in" under Section 1342(b)(2), however, were only $362 million.  2014 Proration Notice at 1.  HHS therefore adopted the pro rata payment methodology it had announced in April 2014, which meant that it would only pay insurers 12.6 percent of the amounts they were owed.  Id.  HHS owed Moda $1,686,016 in Alaska risk corridors payments, and $87,740,414.38 in Oregon risk corridors payments.  With the proration, HHS paid Moda $212,739 for Alaska and $11,070,968 for Oregon.  See Decl. of James Francesconi ¶ 20, Pl. App'x at A4.

HHS explained its proration policy to Robert Gootee, president and CEO of Moda, in a letter dated October 8, 2015.  See Pl. App'x at A101–02.  In the letter, the HHS representative noted:

> I wish to reiterate to you that [HHS] recognizes that the [ACA] requires the Secretary to make full payments to issuers, and that HHS is recording those amounts that remain unpaid following our 12.6% payment this winter as fiscal year 2015 obligations of the United States Government for which full payment is required.

Id. at A102.

On September 9, 2016, HHS announced that it would not make any payments toward its 2015 risk corridors obligations, and would instead use all money it received from profitable plans in 2015 to offset its obligations for the 2014 plan year.[7]  For the 2015 plan year, Moda submitted documentation showing that HHS owed it $136,253,654 in risk corridors payments ($31,531,143 for Alaska, $93,362,051 for Oregon, and $11,360,460 for Washington).   Decl. of James Francesconi ¶ 21, Pl. App'x at A4.   In its 2015 announcement, CMS once again noted that it recognized its liability to insurers for the full amount of its risk corridors obligations.  2015 Payment Notice at 1.  To date, HHS has made no further payments to Moda under the risk corridors program.  Moda claims it is

---

[6]  See CMS, Risk Corridors Payment Proration Rate for 2014 (Oct. 1, 2015), https://www.cms.gov/CCIIO/Programs-and-Initiatives/Premium-Stabilization-Programs/Downloads/RiskCorridorsPaymentProrationRatefor2014.pdf ("2014 Proration Notice").

[7]  See CMS, Risk Corridors Payments for 2015 (Sept. 9, 2016), https://www.cms.gov/CCIIO/Programs-and-Initiatives/Premium-Stabilization-Programs/Downloads/Risk-Corridors-for-2015-FINAL.pdf ("2015 Payment Notice").

14

owed $214,396,377 for the 2014 and 2015 plan years.  Decl. of James Francesconi ¶ 22, Pl. App'x at A4.

It is important to note that the Government now disagrees with the statements HHS has made throughout the risk corridors program's implementation.  HHS has repeatedly recognized its obligation to pay insurers the full amount of their owed risk corridors payments.  At oral argument, however, the Government stated that HHS has no obligation to pay Moda the full amount it is owed if Congress fails to appropriate additional funds for the program.  See Oral Arg. Tr. 25:6–12, Dkt. No. 22 (Jan. 13, 2017).  In other words, the Government contends not merely that HHS had the authority to decide to administer the risk corridors program in a budget-neutral manner over the three-year life of the program, but that the program itself was budget-neutral from the beginning (or at least, that it became budget-neutral later).

G.    Procedural History

Moda filed its complaint on June 1, 2016, seeking damages equal to the difference between the amount it received in risk corridors payments for 2014 and 2015 and the amount it should have received under Section 1342.  See Compl. at 34, Dkt. No. 1.  Moda's complaint asserts causes of action under the ACA and under an implied-in-fact contract theory.  The Government moved to dismiss pursuant to RCFC 12(b)(1) and 12(b)(6) on September 30, 2016.  See Mot. to Dismiss, Dkt. No. 8.  It argues first that this Court has no subject matter jurisdiction because (1) Moda's claims are not for "presently due" money damages, and (2) Moda's claims are not ripe.  It further argues that Moda's claims do not state a claim upon which relief may be granted because (1) the ACA does not require HHS to make risk corridors payments in excess of amounts collected from profitable plans; (2) in the alternative, Congress permissibly made the risk corridors program budget-neutral through its subsequent appropriations riders; and (3) no contract existed between Moda and the Government.

In response to the Government's motion, Moda cross-moved for partial summary judgment as to the Government's liability.  See Cross Mot., Dkt. No. 9 (filed Oct. 25, 2016).  Before the Government could respond, Judge Charles Lettow of this Court issued a decision in a related case: Land of Lincoln Mutual Health Insurance Co. v. United States, 129 Fed. Cl. 81 (2016), appeal docketed, No. 17-1224 (Fed. Cir. Nov. 16, 2016).  Judge Lettow's decision addressed all of the issues in this case and found in the Government's favor on the merits.  The Government subsequently filed a motion to stay this case pending the outcome of the plaintiff's appeal in Land of Lincoln, and this Court denied the motion.  See Order, Dkt. No. 12 (filed Nov. 28, 2016).

After the parties completed their briefing on the cross-motions, Judge Margaret Sweeney of this Court issued a decision in another related case: Health Republic Insurance

15

Co. v. United States, — Fed. Cl. —, 2017 WL 83818 (2017).  In Health Republic, the Government had moved to dismiss solely under RCFC 12(b)(1).  See id. at *1.  Judge Sweeney held that the Court had subject matter jurisdiction over Health Republic's claims, see id. at *10–12, and that those claims were ripe because the Government owed insurers annual payments under Section 1342, see id. at *12–18.  Though the parties here could not address the Health Republic decision in their briefs, they had the opportunity to do so at oral argument on January 13, 2017.  Several other insurers have filed similar suits against the Government in this Court, but Health Republic remains the most recent risk corridors decision.

Discussion

A.    The Court Has Subject-Matter Jurisdiction Over Moda's Claims

    1.    Standard of Review

When a defendant moves to dismiss a complaint under RCFC 12(b)(1), the Court must "assume all factual allegations to be true and . . . draw all reasonable inferences in plaintiff's favor."  Wurst v. United States, 111 Fed. Cl. 683, 685 (2013) (quoting Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995)).  Still, the plaintiff must support its jurisdictional allegations with "competent proof."  McNutt v. Gen. Motors Acceptance Corp. of Indiana, 298 U.S. 178, 189 (1936).  Accordingly, a plaintiff must establish that jurisdiction exists "by a preponderance of the evidence."  Wurst, 111 Fed. Cl. at 685 (citing Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988)).

    2.    The Court Has Subject-Matter Jurisdiction Over Moda's Statutory and Contractual Claims

As sovereign, the United States is immune from suit unless it consents to be sued.  United States v. Sherwood, 312 U.S. 584, 586 (1941).  The Tucker Act, 28 U.S.C. § 1491(a)(1) (2012), waives sovereign immunity for claims predicated on the Constitution, a federal statute or regulation, or a contract with the Government.  Still, the Tucker Act does not create a separate right to money damages, so a plaintiff suing the Government for money damages must base its claims upon a separate source of law that does create such a right.  See United States v. Testan, 424 U.S. 392, 398 (1976).  Here, Moda first predicates its claims on Section 1342 of the ACA and its implementing regulations.  In the alternative, it claims damages for the breach of an implied-in-fact contract with the United States.

Where a plaintiff bases its claims on a statutory or regulatory provision, courts generally find that the provision is money-mandating if it provides that the Government "shall" pay an amount of money.  Greenlee Cnty., Ariz. v. United States, 487 F.3d 871,

16

877 (Fed. Cir. 2007).   On their face, Section 1342 of the ACA and its implementing regulation, 45 C.F.R. § 153.510, require the Government to pay money to Moda and other similarly situated insurers.   Section 1342 states that the Secretary of HHS "shall pay" specific amounts to insurers that offer QHPs, and the regulation states that "QHP issuers will receive payment from HHS."   45 C.F.R. § 153.510(b).   Thus, these provisions are clearly money-mandating, and the Court has subject-matter jurisdiction over Moda's statutory claim.

Where a plaintiff claims that the Government has breached an implied-in-fact contract, it need only make a "non-frivolous *allegation* of a contract with the government." Mendez v. United States, 121 Fed. Cl. 370, 378 (2015) (quoting Engage Learning, Inc. v. Salazar, 660 F.3d 1346, 1353 (Fed. Cir. 2011)) (emphasis in original).   To show jurisdiction, a plaintiff must therefore plead the elements of a contract with the Government: "(1) mutuality of intent to contract; (2) consideration; (3) an unambiguous offer and acceptance; and (4) actual authority on the part of the government's representative to bind the government."   Fisher v. United States, 128 Fed. Cl. 780, 785 (2016) (quoting Biltmore Forest Broad. FM, Inc. v. United States, 555 F.3d 1375, 1380 (Fed. Cir. 2009) (citation omitted)).

Here, Moda alleges that the Government showed mutuality of intent to contract by establishing the risk corridors program, which offers monetary payments to insurers if they offer QHPs on the Exchanges.   Moda further alleges that the parties exchanged consideration: Moda agreed to offer QHPs on the exchanges pursuant to HHS requirements in exchange for the Government's promise to make risk corridors payments if Moda's QHPs turned out to be unprofitable.   Under Moda's theory, HHS extended an offer for a unilateral contract that insurers could accept by offering QHPs on the exchanges, and Moda accepted this offer when it began offering QHPs.   Moda further alleges that the Secretary of HHS has the authority to bind the Government.   Finally, Moda alleges that the Government breached its contract with Moda by paying it less than Moda is owed under the terms of the contract.   At the jurisdictional stage, these non-frivolous allegations are all that is required.   Therefore, the Court also has subject-matter jurisdiction over Moda's contract claim.   Accord Land of Lincoln, 129 Fed. Cl. at 98–99.

The Government does not dispute that both of Moda's claims could conceivably create a right to money damages.   Instead, the Government argues that any money the Government is required to pay Moda is not "presently due" because it is not due until the end of 2017.   It claims that this "presently due" requirement bars the Court's jurisdiction over both of Moda's claims.   See Mot. to Dismiss at 15–19.   However, the Court finds Health Republic persuasive on this point.   See 2017 WL 83818 at *11–12.   The Health Republic court correctly construed the Government's "presently due" argument as a ripeness argument in disguise.   Id. at *12.   The cases from which the Government draws

17

the requirement go to whether equitable relief would be necessary before a court could award the plaintiff monetary relief.  See id. at *11 (distinguishing the Government's cases).  In such a situation, monetary damages are not "presently due" because their availability depends on prior equitable relief, so the plaintiff has not alleged a claim under a money-mandating source of law.  See Todd v. United States, 386 F.3d 1091, 1093–94.

Obviously, the situation is quite different in this case.  Here, the statutory and regulatory provisions Moda cites either require immediate monetary damages or they do not—no equitable relief is involved.  The same is true of Moda's contract claims.  Therefore, in rejecting the Government's "presently due" requirement, the Court merely finds, as a threshold matter, that it has subject-matter jurisdiction over Moda's statutory and contractual claims pursuant to the Tucker Act.  Whether those claims are ripe is a separate question that deserves a more in-depth treatment.

B.     Moda's Claims are Ripe

Even where a court has subject-matter jurisdiction over a plaintiff's claims, it cannot adjudicate those claims if they are not ripe for judicial review.  Health Republic, 2017 WL 83818 at *12.  Though Article III courts developed the ripeness doctrine, its principles are equally applicable in this Article I Court.  See CW Gov't Travel, Inc. v. United States, 46 Fed. Cl. 554, 557–58 (2000).  "Ripeness is a justiciability doctrine that prevents the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements."  Shinnecock Indian Nation v. United States, 782 F.3d 1345, 1348 (Fed. Cir. 2015) (citations and internal punctuation omitted).  Therefore, "[a] court should dismiss a case for lack of ripeness when the case is abstract or hypothetical . . . .  A case is generally ripe if any remaining questions are purely legal ones; conversely, a case is not ripe if further factual development is required."  Rothe Dev. Corp. v. Dep't of Def., 413 F.3d 1327, 1335 (Fed. Cir. 2005).

The Government argues that Section 1342 of the ACA does not set a risk corridors payment schedule.  It follows that HHS has no responsibility to make annual risk corridors payments, but may exercise its discretion to decide when it will make payments over the three-year span of the program.  The last plan year in the program—2016—just ended, and insurers are not required to submit claims for their 2016 plan years until mid-2017.  Therefore, the Government argues, HHS has until the end of 2017 to pay Moda the full amount of its owed risk corridors payments, and Moda's claims are not yet ripe because payment is not yet due.[8]

---

[8]  The Court notes, parenthetically, that this ripeness argument is at odds with the Government's argument on the merits of the case.  In its ripeness argument, the Government argues that full payment is not due until the end of 2017.  In its merits argument, it argues that full payment may never be due.

The <u>Health Republic</u> court dealt exhaustively with the Government's arguments in its comprehensive opinion. It found (1) that Section 1342 and its legislative history require annual risk corridors payments, and (2) in the alternative, that HHS also has interpreted Section 1342 to require annual payments. <u>See</u> <u>Health Republic</u>, 2017 WL 83818 at *12–18. Therefore, the insurer's claims were ripe for adjudication because two annual payments were due (for the 2014 and 2015 plan years). <u>Id.</u> at *18. This Court concurs in full with the <u>Health Republic</u> court's analysis, so there is no need to reinvent a perfectly good wheel. Still, for the sake of clarity, the Court will summarize that analysis here.

### 1.   Section 1342 Requires Annual Risk Corridors Payments

The <u>Health Republic</u> court first turned to Section 1342 itself. <u>See</u> <u>id</u>. at *13–14. That Section does not set a specific payment schedule for the risk corridors program. Still, Section 1342 does offer clues as to Congress's intent. It directs the Secretary of HHS to "establish and administer a program of risk corridors for calendar years 2014, 2015, and 2016," rather than a program for "calendar years 2014 through 2016." <u>Id.</u>; 18 U.S.C. § 18062(a). HHS also must calculate "payments in" and "payments out" of the program on the basis of insurers' costs in "any plan year," not over the life of the program. 18 U.S.C. § 18062(b)(1), (b)(2), (c)(1), (c)(2). These two references to distinct years in Section 1342, while not dispositive, tend to suggest that Congress wanted HHS to make annual payments. <u>Health Republic</u>, 2017 WL 83818 at *14.

Next, the <u>Health Republic</u> court noted that Section 1342 explicitly based the risk corridors program on the Medicare Part D program. <u>See</u> <u>id.</u> at *14; 18 U.S.C. § 18062(a). The statute that created the Medicare Part D program requires the Secretary of HHS to establish a risk corridor "[f]or each plan year," and sets out the requirements that govern each "risk corridor for a plan for a year." 42 U.S.C. § 1395w-115(e)(3)(A). In that statute's implementing regulations, HHS clearly sets out an annual payment schedule for the Medicare Part D risk corridors, and HHS in fact follows an annual payment schedule. <u>See</u> 42 C.F.R. § 423.336(c); <u>Health Republic</u>, 2017 WL 83818 at *14. As the <u>Land of Lincoln</u> court noted, the Medicare Part D statute and Section 1342 are worded differently, so the fact that Section 1342 is "based on" Medicare Part D does not necessarily mean that Section 1342 adopted Medicare Part D's annual payment structure. <u>See</u> <u>Land of Lincoln</u>, 129 Fed. Cl. at 105–06. Still, though the two statutes are worded differently, the differences do not mean Section 1342 rejected an annual payment structure. Indeed, one possible reading of Section 1342 is that the statute incorporates Medicare Part D's annual payment structure by reference. <u>See, e.g.</u>, <u>Lorillard v. Pons</u>, 434 U.S. 575, 581 (1978) ("[W]here . . . Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute."). Therefore, although Congress's reference to Medicare Part

D is not dispositive, it at least tends to show that Congress "approved" of annual risk corridors payments. Health Republic, 2017 WL 83818 at *14.

Finally, the Health Republic court analyzed the function of the risk corridors program. Id. at *15. The program is part of the 3Rs trifecta: reinsurance, risk adjustment, and risk corridors. All three of these programs reflect "a concern that insurers' costs would detrimentally exceed the premiums collected." Id. (describing each of the three programs). The risk corridors program specifically helps avoid this problem by cushioning the initial financial blow to insurers who "underestimated their allowable costs and accordingly set their premiums too low." Id. As such, Congress was aware that if the 3Rs "did not provide for prompt compensation to insurers upon the calculation of amounts due, insurers might lack the resources to continue offering plans on the exchanges." Id. This incentive alone indicates that a three-year payment framework is unlikely, given that courts generally do not "interpret federal statutes to negate their own stated purposes." N.Y. State Dep't of Soc. Servs. v. Dublino, 413 U.S. 405, 419–20 (1973); see also King v. Burwell, 135 S. Ct. 2480, 2496 (2015) ("Congress passed the [ACA] to improve health insurance markets, not to destroy them. If at all possible, we must interpret the Act in a way that is consistent with the former, and avoids the latter."). Furthermore, an insurer's risk corridors payment for a plan year is reduced if the insurer receives payments under the risk-adjustment or reinsurance programs for the same year. See 42 U.S.C. § 18062(c)(1)(B). Therefore, the function and structure of the risk corridors program as part of the ACA's 3Rs suggest that Congress envisioned annual risk corridors payments.

In sum, this Court concurs with the Health Republic court in finding that the above factors—the text of Section 1342, its reference to the Medicare Part D program, and the Section's function—together mean that Congress required HHS to make annual risk corridors payments.[9] Thus, Moda's injury is not abstract or hypothetical because the annual payment deadlines for the 2014 and 2015 plan years have passed, and Moda's claims are ripe.

> 2.   HHS Also Interprets Section 1342 to Require Annual Risk
>       Corridors Payments

Even if Section 1342 were ambiguous as to the risk corridors payment schedule, HHS's interpretation of the program shows that annual payments are required. Courts

---

[9] Even were the Court to accord less weight to these factors, this result would be reasonable because courts read statutes to preserve common law principles. See United States v. Texas, 507 U.S. 529, 534 (1993). Under the common law, a statute that does not set a specific payment timetable nevertheless requires parties to make payments within a reasonable period of time. See Eden Isle Marina, Inc. v. United States, 113 Fed. Cl. 372, 493 (2013); Goodman v. Praxair, Inc., 494 F.3d 458, 465 (4th Cir. 2007). Insurers offer their QHPs on a yearly schedule, so yearly payments are reasonable.

20

defer to an agency's interpretation of ambiguous provisions in a governing statute if that interpretation is reasonable. <u>Chevron U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.</u>, 467 U.S. 837, 842–43 (1984). This standard applies "if Congress either leaves a gap in the construction of the statute that the administrative agency is explicitly authorized to fill, or implicitly delegates legislative authority, as evidenced by 'the agency's generally conferred authority and other statutory circumstances.'" <u>Cathedral Candle Co. v. U.S. Int'l Trade Comm'n</u>, 400 F.3d 1352, 1361 (Fed. Cir. 2005) (quoting <u>United States v. Mead Corp.</u>, 533 U.S. 218, 229 (2001)). Finally, courts "must give substantial deference to an agency's interpretation of its own regulations." <u>Thomas Jefferson Univ. v. Shalala</u>, 512 U.S. 504, 512 (1994) (citation omitted).

In Section 1342, Congress delegated to the Secretary of HHS the authority to "establish and administer a program of risk corridors." 42 U.S.C. § 18062(a). So, as <u>Health Republic</u> noted, if Section 1342 is ambiguous as to the risk corridors payment schedule, its delegation of authority to HHS unquestionably gave HHS the power to create that schedule. <u>See</u> 2017 WL 83818 at *16. Under its statutory grant of authority, HHS promulgated final regulations that govern the risk corridors program. Those rules also are ambiguous as to the program's payment schedule, so the Court therefore must analyze and give deference to HHS's interpretation of its own rules.

Before going on, a clarification is necessary. There are two similar but conceptually distinct questions in this case: (1) whether *annual* payments are required, and (2) whether *full* annual payments are required. The former is a ripeness question, and the latter goes to the merits of this case. There has been considerable confusion on this distinction. The payment schedule alone—<u>i.e.</u>, whether *annual* payments are required—is relevant to the Court's ripeness analysis because it alone determines whether Moda's injury is fixed or hypothetical. If annual payments are not required, then payment for the entire risk corridors program would only be due at the end of the program—<u>i.e.</u>, sometime in 2017. In that case, it would not matter whether the risk corridors program were budget-neutral; Moda's claims would not be ripe because the Government could conceivably still pay Moda for the 2014 and 2015 plan years. In other words, its injury would be hypothetical. If, as the Court finds, annual payments *are* required, then the case is ripe (regardless of whether full payment was required every year) because the 2014 and 2015 payment deadlines have passed. In the latter case, Moda's damages, if any, for each of the two years are fixed, and any further payments HHS makes to Moda for those years would merely mitigate those damages.[10]

---

[10] This point is easily overlooked. For example, <u>Land of Lincoln</u> analyzed the risk corridors payment schedule as a merits issue, reasoning that "[t]he government's argument addresses the merits of whether and when [Plaintiff] is entitled to recover money under the statute. . . ." 129 Fed. Cl. at 98. For ripeness purposes, separating the "when" from the "whether" is a necessary step.

The Government argues that HHS's interpretation "established a three-year payment framework . . . with final payment not due until the final payment cycle in 2017." See Mot. to Dismiss at 17.  This argument conflates the merits question with the ripeness question.  It is true HHS stated repeatedly that it "intend[ed] to administer risk corridors in a budget neutral way over the three-year life of the program, rather than annually." 79 Fed. Reg. at 30,260.  In this and similar statements, however, HHS merely announced that it intended to pay out only what it took in from profitable QHPs over the program's three years.  In other words, HHS announced that it would not make *full* annual payments.  This statement goes to the required quantum of HHS's annual payments—a merits issue the Court analyzes below—but it is, at most, ambiguous as to HHS's actual payment schedule.

So, the Court turns to HHS's interpretation of its payment schedule under its promulgated regulations.  To that end, it is significant that HHS (through CMS) indicated repeatedly that it would make payments every year. See 77 Fed. Reg. at 17,237 (Mar. 23, 2012) ("QHP issuers who are owed these amounts will want prompt payment, and payment deadlines should be the same for HHS and QHP issuers."); 77 Fed. Reg. 73,121 (Dec. 7, 2012) ("[W]e propose . . . an annual schedule for the program and standards for data submissions."); Risk Corridors Mem. at 1 ("[I]f risk corridors collections are insufficient to make risk corridors payments for a year, all risk corridors payments for that year will be reduced pro rata to the extent of any shortfall.").  Furthermore, HHS in fact calculated payments on an annual basis.  For the 2014 plan year, HHS actually paid insurers, albeit in prorated amounts.  HHS did not make payments for the 2015 plan year, but its notice to insurers shows that it calculated the amount it owed insurers for that plan year and recognized its obligation to pay that amount. See 2015 Payment Notice.  Importantly, none of HHS's pronouncements or actions indicate that it believed it could "choose not to make annual risk corridors payments to insurers" if it had the funds to make payments. Health Republic, 2017 WL 83818 at *16.  Instead, HHS followed a rigid annual schedule in practice as well as in interpretation.  In sum, the Court finds that HHS interpreted Section 1342 and its own regulations as requiring annual risk corridors payments to insurers.

Both Section 1342 and HHS's interpretation of Section 1342 require annual payments to insurers.  Moda's injury is "not abstract or hypothetical, and resolution of the issues in this case "does not rest upon contingent events." Id.  As a result, the Court can quite easily determine whether or not full risk corridors payments were required for the 2014 and 2015 plan years.  Moda's claims are therefore ripe for adjudication.

C.      Moda is Entitled to Partial Summary Judgment on the Issue of Liability

The parties have filed cross-motions that address the merits of this case.  First, the Government has moved to dismiss this case under RCFC 12(b)(6) for failure to state a claim upon which relief may be granted.  Under that Rule, a court should dismiss a

plaintiff's claims "when the facts asserted by the [plaintiff] do not entitle [it] to a legal remedy." Lindsay v. United States, 295 F.3d 1252, 1257 (Fed. Cir. 2002). The Court also must construe allegations in the complaint favorably to the plaintiff. See Extreme Coatings, Inc. v. United States, 109 Fed. Cl. 450, 453 (2013). Still, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted)).

Moda has cross-moved for partial summary judgment on the issue of liability. A party is entitled to summary judgment under RCFC 56(a) if the party can show "that there is no genuine dispute as to any material fact and the [party] is entitled to judgment as a matter of law." A court may dispose of statutory interpretation issues and "other matters of law" on a motion for summary judgment. Santa Fe Pac. R. Co. v. United States, 294 F.3d 1336, 1340 (Fed. Cir. 2002). The cross motions essentially debate two legal questions: (1) whether Section 1342 requires full annual payments to insurers, and (2) whether HHS entered into and breached a contract with Moda. The Court will address each issue in turn.

### 1.   Section 1342 Requires Full Annual Payments to Insurers

The Court already has found that HHS was required to make annual risk corridors payments, but determining the amount HHS owed Moda in each annual payment is a merits issue that requires further analysis. Moda argues that the formula set out in Section 1342 itself requires full annual payments. The Government responds with two main arguments. First, it maintains that Congress designed the risk corridors program to be budget-neutral from the beginning. This interpretation would mean that "payments out" of the program to unprofitable insurers would be entirely contingent on the amount of "payments in" to the program from profitable insurers. Second, the Government argues that Congress subsequently affirmed its intent to make the program budget-neutral by limiting the program's funding in appropriations riders—or, alternatively, that these appropriations riders amended the program to make it budget-neutral.

### a.   Congress did not Design Section 1342 to be Budget-Neutral

The Court finds that Section 1342 is not budget-neutral on its face. The Section states that the Secretary of HHS "shall pay" specific amounts of money to insurance plans. See 42 U.S.C. § 18062(b)(1). The amount of money the Secretary must pay is tied to each respective plan's ratio of costs to premiums collected, and the Section gives the Secretary no discretion to increase or reduce this amount. Id.; § 18062(c). It is true that Section 1342(a) gives the Secretary the authority to "establish and administer" the risk corridors program, but the later directive that the Secretary "shall pay" unprofitable plans these specific amounts of money is unambiguous and overrides any discretion the Secretary

23

otherwise could have in making "payments out" under the program.  Finally, there is no language of any kind in Section 1342 that makes "payments out" of the risk corridors program contingent on "payments in" to the program.  Instead, Section 1342 simply directs the Secretary of HHS to make full "payments out."  Therefore, full payments out he must make.

To avoid this obvious conclusion, the Government first points to the preexisting risk corridors program under Medicare Part D.  That program's authorizing statute provides, "This section constitutes budget authority in advance of appropriations Acts and represents the obligation of the Secretary to provide for the payment of amounts provided under this section." 42 U.S.C. § 1395w-115(a).  Still, while including such language in Section 1342 may have shortened this opinion considerably, excluding it does not make a statute budget-neutral.  In fact, other differences between the two statutes suggest that this was not Congress's intent.  For example, the Medicare Part D statute provides only that the Government "shall establish a risk corridor," not that the Secretary of HHS "shall pay" specific amounts to insurers.  The stronger payment language in Section 1342 obligates the Secretary to make payments and removes his discretion, so a further payment directive to the Secretary is unnecessary.

The Government next notes that the CBO did not score the risk corridors program when assessing the financial impact of that program, and argues that this lack of scoring means that Congress believed the program would be budget-neutral when it passed the ACA.  See, e.g., Land of Lincoln, 129 Fed. Cl. at 104 (noting that Congress "explicitly relied on the CBO's findings" when it enacted the ACA).  However, the Court believes the CBO's failure to speak on Section 1342's budgetary impact was simply a failure to speak.  After all, the CBO did score the reinsurance and risk-adjustment programs, both of which are explicitly required to be budget-neutral under their governing regulations.[11]  Therefore, one would assume that it would not be particularly difficult for the CBO to simply score the risk corridors program alongside its budget-neutral sister programs if it expected the program to be budget-neutral.  Instead, the CBO initially kept silent on the risk corridors program's budgetary impact.

Furthermore, the only time the CBO expressly addressed Section 1342's budgetary impact occurred after Congress had passed the ACA.  At that time, the CBO baldly stated

---

[11]  See 45 C.F.R. § 153.230(d) (requiring the reinsurance program to be budget-neutral); 78 Fed. Reg. at 15,441 (describing the risk-adjustment program as budget-neutral).  Note that HHS regulations require these two programs to be budget-neutral, not their governing statutes.  A key difference between the risk corridors program and its two sister programs is that nothing in the other programs' governing statutes requires the Secretary of HHS to pay insurers specific amounts.  See 42 U.S.C. §§ 18061, 18063.  So, it is fair to say that Congress gave HHS discretion to determine whether the risk-adjustment and reinsurance programs would be budget-neutral.

that "risk corridor collections (which will be recorded as revenues) will not necessarily equal risk corridor payments, so that program can have net effects on the budget deficit." CBO Report at 59.  In sum, the CBO's initial failure to score the risk corridors program despite scoring other budget-neutral programs, together with its later statement, suggests that the CBO may never have believed the risk corridors program to be budget-neutral.

Second, the Government argues that Congress did not appropriate additional funds to the risk corridors program specifically, so "payments in" to the program must always have been the only source of such funds available for risk corridors payments.  It cites the September 30, 2014 GAO Opinion, which notes that "Section 1342, by its terms, did not enact an appropriation to make the payments specified in section 1342(b)(1)."  Pl. App'x at A153.  However, if one continues reading the GAO opinion, the GAO actually found two sources of funding for risk corridors payments: the 2014 CMS Program Management appropriation and "payments in" from profitable plans (which it characterized as "user fees").  Id. at A157.[12]  The fiscal year 2014 CMS Program Management appropriation was $3.6 billion—more than enough to cover HHS's 2014 risk corridors obligations to Moda.  See Consolidated Appropriations Act, 2014, Pub. L. No. 113-76 div. H, tit. II, 128 Stat. 5, 374 (2014).  HHS chose not to use the Program Management appropriation for 2014 risk corridors payments, but that appropriation was available for such payments.  Therefore, Congress did not restrict the funding for the risk corridors program to the "payments in" under the program.

Finally, though the Court finds the unambiguous language of Section 1342 dispositive, it is worth noting that HHS itself did not believe the risk corridors program to be budget-neutral from the beginning.  The Land of Lincoln court appeared to be under the opposite impression.  In other words, the court believed HHS's view to be that HHS would never owe money to lossmaking insurers beyond the amount of "payments in" from profitable insurers.  See Land of Lincoln, 129 Fed. Cl. at 106–07.  The court even gave Chevron deference to HHS's supposed view.  Id.  This analysis is puzzling.  In Land of Lincoln and in this case, the Government has only ever argued that Chevron deference is appropriate when considering HHS's three-year payment framework (a ripeness issue).  See Land of Lincoln Oral Arg. Tr., App'x to Pl. Reply Br. at A175, Dkt. No. 18-1 (filed Dec. 22, 2016) ("We are asking for deference to the three-year program as it relates to when payments are due on the statute.  [W]here we say that the statute doesn't require payments beyond collections, we are not asking for deference on that.  I don't think that's an appropriate question for deference."); see also Def. Reply Br. at 12 n.7 (noting, in a

---

[12]  The Government implausibly argues that only "user fees" were available for risk corridors payments because HHS only began making payments during fiscal year 2015.  See Def. Reply Br. at 16–17, Dkt. No. 14 (filed Dec. 9, 2016).  The GAO's opinion flatly contradicts this argument.  It finds that the 2014 CMS Program Management Appropriation "would have been available" for 2014 risk corridors payments.  Pl. App'x at A157.  The fact that HHS decided not to use the appropriation for that purpose is immaterial.

footnote, that the Court "alternatively" could follow <u>Land of Lincoln</u>'s approach).   The Government does not seriously argue that deference is appropriate on the merits issue of HHS's required payment amounts.   Indeed, the gravamen of the Government's argument is that *Congress* intended Section 1342 to be budget-neutral, not that HHS understood the statute to be budget-neutral.   <u>See</u> Def. Reply Br. at 12 ("Count I Fails to State a Claim Because Congress Intended That Risk Corridors Payments Be Limited to Collections.").

It is easy to see why the Government has not argued that HHS's interpretation of its payment obligations deserves deference: it would undermine the Government's position. HHS has consistently recognized that Section 1342 is not budget-neutral.   As it formulated its regulations, HHS even stated, "The risk corridors program is not statutorily required to be budget neutral.   Regardless of the balance of payments and receipts, HHS will remit payments as required under section 1342 of the [ACA]."  78 Fed. Reg. at 15,473.  Though it later changed course and averred that it "intend[ed] to implement this program in a budget neutral manner," <u>see</u> 79 Fed. Reg. 13,787, its later statements show that it clearly recognized an obligation to provide full risk corridors payments to insurers at some point. <u>See</u> 79 Fed. Reg. at 30,260 (May 27, 2014) ("HHS recognizes that the [ACA] requires the Secretary to make full payments to issuers. . . .  HHS will use other sources of funding for the risk corridors payments, subject to the availability of appropriations."); Robert G. Gootee, Ltr., Pl. App'x at A102 (Oct. 8, 2015) (" [HHS] recognizes that the [ACA] requires the Secretary to make full payments to issuers, and . . . HHS is recording those amounts that remain unpaid . . . as fiscal year 2015 obligations of the United States Government for which full payment is required"); 2015 Payment Notice at 1 (Sept. 9, 2016) ("HHS recognizes that the [ACA] requires the Secretary to make full payments to issuers."). Indeed, HHS has put off answering questions as to what it plans to do if "payments in" for 2016 do not cover its full outstanding obligations to insurers—a situation that, barring a miracle, seems certain to occur.  <u>See</u> 2015 Payment Notice at 1 ("[I]n the event of a shortfall for the 2016 benefit year, HHS will explore other sources of funding for risk corridors payments, subject to the availability of appropriations.   This includes working with Congress on the necessary funding for outstanding risk corridors payments.").  To be sure, HHS has not been able to pay insurers because it does not have the funds to do so.  Still, it has never conflated its inability to pay with the lack of an obligation to pay.

To summarize, the Court finds that Congress did not initially make Section 1342 budget-neutral.  Therefore, Section 1342 only could have become budget-neutral through later repeal or amendment.

b. <u>Later Appropriations Riders did not Vitiate HHS's Statutory Duty to Make Risk Corridors Payments</u>

The Government argues that even if funds were initially available for risk corridors payments, Congress's subsequent appropriations riders restricted these funds' availability and made Section 1342 budget-neutral.[13]  As noted above, the GAO informed Congress in 2014 that two sources of funding existed for risk corridors payments: "payments in" to the program and the 2014 CMS Program Management appropriation.  Congress passed appropriations riders for the fiscal years 2015 and 2016 that placed the CMS Program Management appropriation off-limits for risk corridors payments.  In both years, the text of the restriction was as follows:

> None of the funds made available by this Act from the Federal Hospital Insurance Trust Fund or the Federal Supplemental Medical Insurance Trust Fund, or transferred from other accounts funded by this Act to the "Centers for Medicare and Medicaid Services-Program Management" account, may be used for payments under section 1342(b)(1) of [the ACA] (relating to risk corridors).

128 Stat. at 2491; 129 Stat. at 2624.  As noted above, the 2016 Act had another funding restriction:

> In addition to the amounts otherwise available for "Centers for Medicare and Medicaid Services, Program Management", the Secretary of Health and Human Services may transfer up to $305,000,000 to such account from the Federal Hospital Insurance Trust Fund and the Federal Supplementary Medical

---

[13]   The Court notes parenthetically that, under the GAO's logic, certain CMS Program Management appropriation funds probably were available for 2015 risk corridors payments.  Congress passed three continuing resolutions in the first two-and-a-half months of fiscal year 2015.  <u>See</u> Continuing Appropriations Resolution, 2015, Pub. L. 113-164, § 101(a)(8), 128 Stat. 1867, 1867 (2014); Joint Resolution, Pub. L. 113-202, 128 Stat. 2069 (2014); Joint Resolution, Pub. L. 113-203, 128 Stat. 2070 (2014).  The previously-enacted 2014 appropriations statute had provided $3.6 billion to the CMS Program Management account, and the continuing resolutions continued funding this account "at a rate of operations as provided in the applicable appropriations acts for fiscal year 2014," with a small decrease of about 0.6 percent.  128 Stat. at 1867–68.  Therefore, the resolutions allocated roughly $750 million of unrestricted appropriations to the CMS Program Management account for the first two-and-a-half months of fiscal year 2015.  Though Congress later restricted the use of the CMS Program Management appropriation, the GAO's logic means that this $750 million likely was available for 2015 risk corridors payments.  The fact that this sum would not have been enough to satisfy other insurers' risk corridors claims is immaterial for the purposes of this case.  <u>See</u> <u>Salazar v. Ramah Navajo Chapter</u>, 132 S. Ct. 2181, 2189-90 (2012).

> Insurance Trust Fund to support program management activity
> related to the Medicare program: Provided, That except for the
> foregoing purpose, such funds may not be used to support any
> provision of [the ACA] or Public Law 111-152 (or any
> amendment made by either such Public Law) or to supplant
> any other amounts within such account.

Id. at 2625.

The Government argues that these funding limitations either show that Congress initially meant for the risk corridors program to be budget-neutral or that they constitute a later amendment that made the program budget-neutral. The Court already has found that Section 1342 was not initially budget-neutral.[14] Therefore, the remaining question is whether Congress's later appropriations riders made it budget-neutral.

Generally, a funding restriction in an appropriations law does not amend or repeal a substantive law that imposes payment obligations on the Government. N.Y. Airways, Inc. v. United States, 369 F.2d 743, 749 (Ct. Cl. 1966). Further, "[r]epeals by implication are not favored." United States v. Langston, 118 U.S. 389, 393 (1886). Courts have applied this approach for practical reasons. Repealing an obligation of the United States is a serious matter, and burying a repeal in a standard appropriations bill would provide clever legislators with an end-run around the substantive debates that a repeal might precipitate. See Gibney v. United States, 114 Ct. Cl. 38, 51 (1949). So, "the uniform rule was that if [the restriction] were simply a withholding of funds and not a legislative provision under the guise of a withholding of funds[,] it had no effect whatever on the legal obligation." Id.

Therefore, for an appropriations law to affect the underlying legal obligation, "[t]he intent of Congress to effect a change in the substantive law via provision in an appropriation act must be clearly manifest." N.Y. Airways, 369 F.2d at 749. In general, to determine whether Congressional intent was clearly manifest, courts look first to the language of the appropriations law. See, e.g., id. at 750 ("If the purpose of the limiting language in the appropriation under consideration . . . was to suspend or amend section 406(c) of the Federal Aviation Act of 1958, it was not so expressed by statute."). They then look to ancillary considerations, such as the legislative history of the appropriations

---

[14] Furthermore, given the vagaries of the political system, it would be illogical to divine the intent of a former Congress from the actions of a later one. See, e.g., United States v. United Mine Workers of Am., 330 U.S. 258, 281-82 (1947) ("We fail to see how the remarks of these Senators in 1943 can serve to change the legislative intent of Congress expressed in 1932."). If anything, this is even more true in the context of the ACA, which has been the subject of a highly public political battle since its inception.

law, although any congressional intent expressed therein must be "clear and uncontradicted." Id.

Several courts have refused to find that appropriations laws amended or repealed the Government's substantive obligations, while others have found the opposite when confronted with different statutes.   To determine which category applies to the appropriations riders in this case, it therefore is necessary to examine the features courts look for in appropriations laws that result in repeal or amendment.

Four relevant cases have refused to find a repeal or amendment.  For example, in Langston, the Supreme Court analyzed the Government's failure to appropriate funds to pay the U.S. Ambassador to Haiti his full salary.  118 U.S. at 393.  His salary was $7,500, but Congress appropriated only $5,000 to pay him for two subsequent years.  Id.  The Supreme Court reasoned that the appropriations acts did not "contain[] any language to the effect that such sum shall be 'in full compensation' for those years; nor was there in either of them an appropriation of money 'for additional pay,' from which it might be inferred that congress intended to repeal the [salary] act." Id.  The Court therefore found "no words that expressly, or by clear implication, modified or repealed the previous law." Id. at 394.

The Court of Claims (the predecessor to the Federal Circuit) subsequently decided Gibney.  In Gibney, the Federal Employees Pay Act of 1946 provided that "employees should be paid, for work beyond an eight-hour day on ordinary days, one-half day's additional pay for each two hours or major fraction thereof, and, for work on a Sunday or holiday, two additional days' pay."   114 Ct. Cl. at 48.   In a later appropriations act, Congress included the following language:

> Provided, That none of the funds appropriated for the Immigration and Naturalization Service shall be used to pay compensation for overtime services other than as provided in the Federal Employees Pay Act of 1945 (Public Law 106, 79th Cong., 1st sess.), and the Federal Employees Pay Act of 1946 (Public Law 390, 79th Cong., 2d sess.).

Id. at 44.  The Court of Claims found that this language "was a mere limitation on the expenditure of a particular fund (the funds appropriated to the Immigration and Naturalization Service) and had no other effect." Id. at 50.

The Court of Claims further developed its jurisprudence on the substantive effects of appropriations laws in New York Airways.  In that case, the Civil Aeronautics Board set a monthly subsidy for helicopter companies, as authorized by statute.  369 F.2d at 744.  In an appropriations law, Congress included the following provision:

29

> For payments to air carriers of so much of the compensation
> fixed and determined by the Civil Aeronautics Board under
> section 406 of the Federal Aviation Act of 1958 (49 U.S.C.
> 1376), as is payable by the Board, including not to exceed
> $3,358,000 for subsidy for helicopter operations during the
> current fiscal year, $82,500,000, to remain available until
> expended.

Id. at 812.  The subsidy Congress granted was less than the amount the Board had fixed pursuant to its authorizing statute.  Id. at 810–11.  The Court of Claims found that the House of Representatives had included this provision "to gradually eliminate helicopter subsidies from appropriations."  Id. at 814.  Nevertheless, "key congressmen who spoke on the subject fully understood that the commitment to pay subsidy compensation decreed by the Board for helicopter carriers was a binding obligation of the Government in the courts even in the failure of Congress to appropriate the necessary funds."  Id. at 815. Therefore, the appropriations law did not amend or repeal the Government's substantive obligation.  Id. at 815, 818.

Finally, in District of Columbia v. United States, 67 Fed. Cl. 292 (2005), the Government argued that Congress's failure to appropriate funds to HHS for statutorily required building renovations necessarily narrowed the Government's liability for those renovations.  Id. at 346.  The court disagreed, finding that Congress's failure to appropriate sufficient funds did "not mean that the government's obligation ha[d] been fulfilled under the . . . Act, or that the [Plaintiff] is precluded from seeking additional funds owed to it." Id. at 335.  Citing New York Airways, the court noted that "an appropriation with limited funding is not assumed to amend substantive legislation creating a greater obligation."  Id. (citing N.Y. Airways, 177 F.2d at 749).  Though the Government cited some legislative history that suggested an intent to partially defund the renovations, this history was not "unambiguous," so the court did not accord it much weight.  Id.

In contrast, two other relevant decisions have analyzed appropriations laws that suspended or repealed previous statutory obligations.  First, in United States v. Dickerson, the Supreme Court confronted a situation where a statute promised an enlistment allowance to honorably discharged soldiers who reenlisted. 310 U.S. 554, 554–55 (1940).  Congress passed an appropriations law that stated, in pertinent part:

> [N]o part of any appropriation contained in this or any other
> Act for the fiscal year ending June 30, 1939, shall be available
> for the payment of any enlistment allowance for reenlistments
> made   during   the   fiscal   year   ending   June   30,   1939,

30

> notwithstanding the applicable portions of [the act authorizing
> reenlistment payments].

Id. at 555 (internal punctuation omitted).  The Court extensively analyzed the legislative history of the appropriations law.  Id. at 555–62.  It found "that Congress intended the legislation . . . as a continuation of the suspension enacted in each of the four preceding years."  Id. at 561.  Therefore, the plaintiff could not recover.  Id. at 562.

Next, in United States v. Will, 449 U.S. 200 (1980), several appropriations laws purported to eliminate a pay raise for federal judges.  Specifically, the first of the appropriations statutes the Court analyzed provided that "[n]o part of the funds appropriated in this Act or any other Act shall be used to pay the salary" of these judges at a rate that exceeded the previous salary rate.  Id. at 205–06.  The second, enacted for the next fiscal year, stated that the raises "shall not take effect" that year.  Id. at 206–07.  For the next fiscal year, another statute provided that "[n]o part of the funds appropriated for the fiscal year . . . by this Act or any other Act may be used to pay the salary or pay of any individual in any office or position" in the judicial branch that exceeded the preexisting rate.  Finally, in the fourth consecutive fiscal year, another statute stated that funds would not be appropriated to pay any judges "in excess of [a] 5.5 percent increase in existing pay and such sum if accepted shall be in lieu of the 12.9 percent due for such fiscal year."  Id. at 208.

Faced with such unequivocal statutory language, the Court found that Congress had intended to repeal or postpone the judges' pay increases in each of these fiscal years.  Id. at 222.  The legislative history confirmed this intent, and even referred to these statutes variously as "pay freezes" or "caps."  Id. at 223–24.  Therefore, "[t]hese passages indicate[d] clearly that Congress intended to rescind these raises entirely, not simply to consign them to the fiscal limbo of an account due but not payable."  Id. at 224.[15]

This case is more like the first group of cases than the second.  First, the statutory language supports this conclusion.  The appropriations riders at issue here are the most similar to the funding restriction in Gibney.  As in Gibney, the appropriations riders limit only the use of funds appropriated to a specific account: the "Centers for Medicare and Medicaid Services-Program Management" account.  128 Stat. at 2491; 129 Stat. at 2624.  Furthermore, unlike in Dickerson and Will, the riders do not expand the limitation to other sources of funds.  In Dickerson, the appropriations act stated that no appropriation

---

[15]   The Government also cites a Tenth Circuit case with similar appropriations language.  In Republic Airlines, Inc. v. U.S. Department of Transportation, 849 F.2d 1315 (10th Cir. 1988), a statute stated that, "notwithstanding any other provision of law," funds payable to air carriers under a certain statute "shall not exceed" $14 million.  Id. at 1317–18.  The court held that this modified the substantive statutory obligation.  Id. at 1322.

"contained in this or any other Act" for the current fiscal year would be used to make reinlistment payments, "notwithstanding" the law authorizing such payments. Similarly, in <u>Will</u>, no funds "appropriated in this Act or any other Act" were to be used for the judges' pay raises. In fact, one of the statutes in <u>Will</u> stated that the raises "shall not take effect" during one fiscal year. In contrast, the appropriations riders at issue here state only that "[n]one of the funds made available by this Act" from specific funds "to the 'Centers for Medicare and Medicaid Services-Program Management' account, may be used for payments." Thus, the limitation in this case singles out a specific use for a specific account. It does not, unlike <u>Dickerson</u> and <u>Will</u>, bar any appropriated funds from being used for a given purpose.

The difference in wording between the appropriations riders here and the appropriations restrictions in <u>Dickerson</u> and <u>Will</u> is not merely semantic or historical. In fact, the very same appropriations laws in which the CMS Program Management restriction appears contain appropriations restrictions that are virtually identical to those in <u>Dickerson</u> and <u>Will</u>. Consider, for example, Section 753 of the appropriations law for fiscal year 2015:

> None of the funds made available by this Act or any other Act may be used to exclude or restrict, or to pay the salaries and expenses of personnel to exclude or restrict, the eligibility of any variety of fresh, whole, or cut vegetables (except for vegetables with added sugars, fats, or oils) from being provided under the Special Supplemental Nutrition Program for Women, Infants, and Children under section 17 of the Child Nutrition Act of 1966 . . . .

128 Stat. at 2172. The presence of this language in the 2015 appropriations law and in the <u>Dickerson</u> and <u>Will</u> statutes suggests that Congress has consistently used similar phrases whenever it wishes to block a statutory obligation in an appropriations law. In other words, Congress knows that this phrase represents a silver bullet to whatever statutory obligation it targets. With that it mind, it is telling that Congress did not use the "this act or any other act" language in the CMS Program Management restriction. The omission suggests that Congress meant only to prevent HHS from using the CMS Program Management account for risk corridors payments, not that it meant to bar all other sources of funding for such payments.

The legislative history also supports this conclusion. In the fiscal year 2015 appropriations rider, Congress indicated in an Explanatory Statement that the funding restriction was intended "to prevent the CMS Program Management appropriation account from being used to support risk corridors payments." 160 Cong. Rec. H9838. Similarly,

in the fiscal year 2016 appropriations rider, the Senate Committee Report stated that the rider "requir[es] the administration to operate the Risk Corridor program in a budget neutral manner by prohibiting any funds from the Labor-HHS-Education appropriations bill to be used as payments for the Risk Corridor program. S. Rep. No. 114-74, at 12. Both of these statements indicate that Congress knowingly cut off funding for the risk corridors program from one specific account—the CMS Program Management account—and from that account only. It did not believe it was depriving the risk corridors program of funding from other accounts. As the Senate Committee Report notes, cutting off this source of funding for risk corridors payments forced the administration to operate the program in a budget-neutral manner. It did not reduce the obligation of the Government as a whole.[16]

Importantly, this Court is not the administration, and its judgments are not paid out of the CMS Program Management account. The Government argues that limiting the availability of the CMS Program Management account meant that the Government was only obligated to make "payments out" equal to the "payments in" from profitable QHPs. Other than these "payments in," the logic goes, there was no appropriation left that could cover the excess cost of the "payments out." After all, "[n]o money shall be drawn from the treasury, but in consequence of appropriations made by law." U.S. Const. art I, sec. 8, cl. 7.

However, there is an appropriation here. The Judgment Fund pays plaintiffs who prevail against the Government in this Court, and it constitutes a separate Congressional appropriation. See 28 U.S.C. § 2517(a); 31 U.S.C. § 1304(a)(3)(A). Its authorizing statute was "intended to establish a central, government-wide judgment fund from which judicial tribunals administering or ordering judgments, awards, or settlements may order payments without being constrained by concerns of whether adequate funds existed at the agency level to satisfy the judgment." Bath Iron Works Corp. v. United States, 20 F.3d 1567, 1583 (Fed. Cir. 1994). The Federal Circuit has clarified that the Judgment Fund is even available where an agency has refused to pay the plaintiff because Congress has limited the funds from which the agency may draw. In Bath Iron Works, Congress had passed a statute that limited "payment of appropriated Defense Department funds for administrative adjustments by a Defense Department Service Secretary." Id. The Federal Circuit reasoned that the appropriations statute did not purport to amend either the statute that obligated the Government to pay money—the Contract Disputes Act—or the Judgment

---

[16] Furthermore, given the then-President's strong opposition to any legislation that sought to amend or repeal the ACA, it is somewhat unlikely that Congress could have expressed an intent to effectively amend the risk corridors program. If it had, then the appropriations laws may have faced a veto threat. See, e.g., Gregory Korte, Obama Uses Veto Pen Sparingly, But Could That Change?, USA Today, Nov. 19, 2014 (noting that President Obama had threatened to veto twelve different bills that would have repealed or amended the ACA), http://www.usatoday.com/story/news/politics/2014/11/19/obama-veto-threats/19177413/.

Fund statute.  Id.; see also Wetsel-Oviatt Lumber Co. v. United States, 38 Fed. Cl. 563, 571 (1997) ("[A]ssuming the [agency] does not have appropriations from which to compensate Wetsel, there exists a statutory appropriation [in the Judgment Fund] from which the government is permitted to pay Wetsel.").

At oral argument, the Government averred that the Court cannot consider the availability of the Judgment Fund at all in finding liability ex ante.  See Oral Arg. Tr. at 55.  The Court disagrees.  In a way, the differences between the statutes in Dickerson and Gibney only become significant when one considers the availability of the Judgment Fund.  If an appropriations law limits funds appropriated "in this or any other Act," for example, "any other Act" includes the Judgment Fund appropriation (31 U.S.C. § 1304), so the Government's liability in this Court is foreclosed.  In contrast, making funds from a specific account unavailable to a specific agency for a specific purpose "prevents the accounting officers of the Government from making disbursements," but private parties may still recover their funds in this Court.  N.Y. Airways, 369 F.2d at 749.  As a policy matter, it is certainly unfortunate that HHS's inability to access the CMS Program Management account for risk corridors payments means that insurers like Moda must receive risk corridors payments from the Judgment Fund.  However, Congress has not modified those insurers' substantive right to those payments under Section 1342, so the Judgment Fund is the only path Congress has left open.  Therefore, the Court finds that the appropriations riders at issue here did not modify or repeal the Government's obligation under Section 1342 to make "payments out" to lossmaking QHP issuers.

In conclusion, the Court finds that Moda is entitled to summary judgment on the issue of liability.  Section 1342 requires full annual payments to insurers, and the Government has not made these payments.  Furthermore, Congress has not modified the risk corridors program to make it budget-neutral.  As a result, there is no genuine dispute that the Government is liable to Moda under Section 1342.

> 2.  In the Alternative, the Government Breached an Implied-in-Fact Contract with Moda by Refusing to Make Full Risk Corridors Payments

Though the Court could rest on its statutory entitlement ruling, the facts just as strongly indicate that the Government breached an implied-in-fact contract when it failed to pay Moda.  Therefore, the Court finds in the alternative that Moda is entitled to summary judgment on that basis.

The elements of an implied-in-fact contract are identical to those of an express contract.  See Trauma Serv. Grp. v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997).  So, to establish liability on a breach of contract claim, the plaintiff seeking summary

judgment must show that there is no genuine dispute as to four elements: (1) mutuality of intent to contract, (2) consideration, (3) "lack of ambiguity in offer and acceptance," and (4) that the "[G]overnment representative whose conduct is relied upon [has] actual authority to bind the [G]overnment in contract." Lewis v. United States, 70 F.3d 597, 600 (Fed. Cir. 1995) (citation omitted).

### a.  There was Mutuality of Intent to Contract

Clearly, the Government does not intend to bind itself in contract whenever it creates a statutory or regulatory incentive program. Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co., 470 U.S. 451, 465–66 (1985). Therefore, "absent some clear indication that the legislature intends to bind itself contractually, the presumption is that a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise." Id. (citation omitted). Courts should "proceed cautiously both in identifying a contract within the language of a regulatory statute and in defining the contours of any contractual obligation." Brooks v. Dunlop Mfg. Inc., 702 F.3d 624, 631 (Fed. Cir. 2012).

However, statutory or regulatory provisions that do bind the Government in contract have certain hallmarks.  First, the provision must create a program that offers specified incentives in return for the voluntary performance of private parties.  See Radium Mines, Inc. v. United States, 153 F. Supp. 403, 405–06 (Ct. Cl. 1957).  This performance must be in the form of an actual undertaking; simply "fill[ing] in the blanks of a Government prepared form," such as an application, does not constitute acceptance by performance. Cutler-Hammer, Inc. v. United States, 441 F.2d 1179, 1183 (Ct. Cl. 1971).  Second, the provision must be promissory; in other words, it must give the agency officials administering the program no discretion to decide whether or not to award incentives to parties who perform.  See Radium Mines, 153 F. Supp. at 406.  In short, statutes or regulations show the Government's intent to contract if they have the following implicit structure: if you participate in this program and follow its rules, we promise you will receive a specific incentive.

For example, in Radium Mines, the Government created an incentive program in which an agency Circular promised payment at a "guaranteed minimum price" to private parties who had uranium and wished to sell it. Id. at 404–05. Further, the Government had restricted private uranium production to such an extent that private parties essentially produced uranium for sale to the Government only. Id. at 406. The Government argued that it did not intend to make an offer in its Circular, but merely an invitation to offer. Id. at 405. The Court of Claims rejected this argument, stating,

> It could surely not be urged that one who had complied in every respect with the terms of the Circular could have been told by the Government that it would pay only half the 'Guaranteed Minimum Price,' nor could he be told that the Government would not purchase his uranium at all."

Id. at 406.  So, agency officials had no discretion to determine (1) whether they would purchase uranium offered to them, or (2) the price they would pay producers.  Therefore, the Circular was an offer, and the Government had shown intent to contract.  Id. at 405–06.

New York Airways also is instructive.  In that case, as noted above, a statute authorized the Civil Aeronautics Board to set a monthly subsidy for helicopter companies.  369 F.2d at 744.  The statute further stated, "The Postmaster General shall make payments out of appropriations for the transportation of mail by aircraft of so much of the total compensation as is fixed and determined by the Board under this section. . . ." Id. at 745.  Congress then failed to appropriate the necessary funds to pay the compensation the Board "fixed and determined," so the Postmaster General did not pay the helicopter companies.  Id. at 745–46.  While the Court of Claims found that helicopter companies could recover under the original statute (see above), it also ruled in the alternative that "[t]he Board's rate order was, in substance, an offer by the Government to pay the plaintiffs a stipulated compensation for the transportation of mail, and the actual transportation of the mail was the plaintiffs' acceptance of that offer." Id. at 751.  So, again, both of the required elements were present: (1) an incentive program that private parties could join voluntarily by performing services according to the program's rules, and (2) a firm Government promise to pay those parties a fixed amount if they performed the required services.

It is true that ARRA Energy Co. I v. United States, 97 Fed. Cl. 12 (2011), disagrees with this framework.  In ARRA Energy, the court articulated a simpler test, namely, that the plaintiff "must point to specific language in [the statute] or to conduct on the part of the government that allows a reasonable inference that the government intended to enter into a contract." Id. at 27.  The court took this statement quite literally, finding that Section 1603 of the American Recovery and Reinvestment Act of 2009 did not show the Government's intent to contract because it did not specifically require the Government to enter into contracts.  Id. at 27–28.  The Court disagrees with ARRA Energy's interpretation.  Neither Radium Mines nor New York Airways turned on the invocation of the magic word "contract" in the statutes they examined.  Rather, both cases examined the *structure* of a statutory program and determined whether the Government had expressed its intent to contract by using that structure.

36

The ACA meets the criteria set out in <u>Radium Mines</u> and <u>New York Airways</u>.  First, it created an incentive program in the form of the Exchanges on which insurers could voluntarily sell QHPs.  Insurers' performance went beyond filling out an application form; they needed to develop QHPs that would satisfy the ACA's requirements and then sell those QHPs to consumers.  In return for insurers' participation, the Government promised risk corridors payments as a financial backstop for unprofitable insurers.  Finally, as discussed in detail above, Section 1342 specifically directs the Secretary of HHS to make risk corridors payments in specific sums, and HHS has no discretion to pay more or less than those sums.  Therefore, the Government intended to enter into contracts with insurers, and there was mutuality of intent to contract.

> b.  <u>Moda Accepted the Government's Offer, and the Condition Precedent to Payment was Satisfied</u>

Of course, because the ACA shows that the Government intended to enter into contracts with insurers, it is also an offer on the part of the Government.  Specifically, the Government offered to enter into a unilateral contract with insurers like Moda.  In a unilateral contract, the offeree may only accept the offer by performing its contractual obligations.  <u>See</u> <u>Contract</u>, Black's Law Dictionary (10th ed. 2014) (defining "unilateral contract" as "[a] contract in which only one party makes a promise or undertakes a performance."); <u>see also</u> <u>Lucas v. United States</u>, 25 Cl. Ct. 298, 304 (1992) (explaining that a prize competition is a unilateral contract because it requires participants to submit entries in return for a promise to consider those entries and award a prize).  Here, the Government has promised to make risk corridors payments in return for Moda's performance.  Moda accepted this offer through performance.  It sold QHPs on the health benefit exchanges while adhering to the ACA's requirements.

At oral argument, the Government claimed that Moda's reliance on the Government's promise to pay was immaterial to its contractual claim.  <u>See</u> Oral Arg. Tr. at 14.  Reliance may be immaterial to contract formation; however, Moda has not really made a reliance argument here.  When the offeree fully performs under a unilateral contract in response to the offeror's promise of payment, then one does not say that the offeree performed "in reliance" on the offeror's promise.  Rather, the offeree's performance constitutes an acceptance, and it means that the offeror's duty to pay has fully matured under the contract.  <u>See, e.g.</u>, Restatement (Second) of Contracts § 53 (Acceptance by Performance); <u>cf.</u> <u>Winstar Corp. v. United States</u>, 64 F.3d 1531, 1545 (Fed. Cir. 1995) ("When the plaintiffs satisfied the conditions imposed on them by the contracts, the government's contractual obligations became effective and required it to recognize and accept the purchase method of accounting . . . and the use of supervisory goodwill and capital credits as capital assets for regulatory capital requirements."), <u>aff'd and remanded</u>, 518 U.S. 839 (1996).

In addition, for the Government's payment obligation under the unilateral contract to mature, a condition precedent had to be satisfied: Moda's QHPs needed to be lossmaking. A condition precedent is an event that, if it does not occur, can discharge one party's duty to perform under the contract. See Restatement (Second) of Contracts § 224. If Moda's QHPs were profitable, then no risk corridors payments would have come due under Section 1342. Because the QHPs were unprofitable, the condition precedent was therefore satisfied.

### c.   There was Consideration

Consideration is a bargained-for performance or return promise. Restatement (Second) of Contracts § 71. Here, the Government offered consideration in the form of risk corridors payments under Section 1342. In return, Moda offered performance under the contract by providing QHPs to consumers on the Health Benefit Exchanges. Therefore, there was consideration.

### d.   The Secretary of HHS had Actual Authority to Contract on the Government's Behalf

"An agent's actual authority to bind the Government may be either express or implied." Marchena v. United States, 128 Fed. Cl. 326, 333 (2016) (citing Salles v. United States, 156 F.3d 1383, 1384 (Fed. Cir. 1998)). Authority is implied when it is "considered to be an integral part of the duties assigned to a government employee." H. Landau & Co. v. United States, 886 F.2d 322, 324 (Fed. Cir. 1989) (citation omitted). Here, Section 1342 states that the Secretary of HHS "shall establish" the risk corridors program and "shall pay" risk corridors payments. More generally, the Secretary is responsible for administering the ACA. See ACA §§ 1301(a)(1)(C)(iv), 1302(a)–(b), 1311(c)–(d). As discussed above, the ACA itself creates a contractual framework. Therefore, entering into contracts pursuant to the contractual structure of the risk corridors program is an integral part of the Secretary's duties in administering and implementing the ACA, and the Secretary had implied actual authority to contract.

The Government argues that the Anti-Deficiency Act, 31 U.S.C. § 1341(a)(1)(B), cabins the Secretary's authority to enter into contracts under the ACA. That Act provides that the Government "may not . . . involve [the] government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law." The Court of Claims faced a similar statute in New York Airways, stating, "Since it has been found that the Board's action created a 'contract or obligation (which) is authorized by law', obviously the statute has no application to the present situation." 369 F.2d at 152. Similarly, the Secretary of HHS is explicitly authorized to make risk corridors payments in specific amounts under the ACA. Therefore, the secretary is "authorized by law" under

the ACA to make risk corridors payments pursuant to implied-in-fact contracts with insurers, and the implied-in-fact contract does not fall under the Anti-Deficiency Act.[17]

### e.  No Further Discovery is Necessary

Finally, the Government claims that further discovery is necessary before the Court can rule that an implied-in-fact contract exists between Moda and the Government.  Def. Reply Br. at 30–31.  The Court disagrees.  As shown above, the Court finds as a matter of law that an implied-in-fact contract exists between Moda and the Government, and further discovery as to the parties' subjective intentions would not change the Court's conclusion. Furthermore, if the nonmovant on a summary judgment motion believes "it cannot present facts essential to justify its opposition," it is required to bring this belief to the Court's attention "by affidavit or declaration."  RCFC 56(d).  The Court highly doubts that the Government does not have access to the facts necessary to justify its opposition. Regardless, the Government has not submitted the necessary affidavit or declaration. Therefore, the Government's informal request for discovery is denied.

In sum, the ACA created an implied-in-fact contract with insurers like Moda under which the Government owed Moda risk corridors payments if (1) Moda sold QHPs on the Exchanges and (2) those QHPs were lossmaking.  Moda sold QHPs and suffered losses. The Government has breached the contract by failing to make full risk corridors payments as promised.  Therefore, there is no genuine dispute that the Government is liable to Moda under the implied-in-fact contract, and Moda also is entitled to partial summary judgment on that basis.

### Conclusion

There is no genuine dispute that the Government is liable to Moda.  Whether under statute or contract, the Court finds that the Government made a promise in the risk corridors program that it has yet to fulfill.  Today, the Court directs the Government to fulfill that promise.  After all, "to say to [Moda], 'The joke is on you.  You shouldn't have trusted us,' is hardly worthy of our great government."  Brandt v. Hickel, 427 F.2d 53, 57 (9th Cir. 1970).  Moda's cross-motion for partial summary judgment is GRANTED.  The Government's motion to dismiss is DENIED.

---

[17]  Furthermore, just as Congress did not modify its statutory obligation through the appropriations riders, it also did not modify its contractual obligation.  See, e.g., Salazar, 132 S. Ct. at 2189 ("[T]he Government is responsible to the contractor for the full amount due under the contract, even if the agency exhausts the appropriation in service of other permissible ends.").

The Court requests that counsel for the parties submit a joint status report on or before March 1, 2017, indicating the proposed steps and schedule for completing the resolution of this action.

IT IS SO ORDERED.

s/ Thomas C. Wheeler
THOMAS C. WHEELER
Judge